UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ENOCH DONNELL HALL,

        Plaintiff,

vs.

                          Case No. 3:15-cv-824-J-39JRK

JOHN PALMER etc.; et al.,

        Defendants.

_____

**<u>ORDER</u>**

## I.  Status

Plaintiff Enoch Donnell Hall is an inmate confined on death row at Florida State Prison (FSP). He is proceeding on a Fourth Amended Complaint - Injunctive Relief Sought (Fourth Amended Complaint) (Doc. 22) pursuant to 42 U.S.C. § 1983 and is represented by counsel. Plaintiff filed his original Complaint (Doc. 1) pro se on July 1, 2015.

This cause is before the Court on two pending motions to dismiss: Defendants' [Jones, Gay, McClellan, and Palmer] Motion to Dismiss and/or Sever (Defendants' Motion) (Doc. 35) and Defendant Ellis' Motion to Dismiss (Ellis' Motion) (Doc. 51).[1] Plaintiff filed responses to these motions. <u>See</u> Plaintiff's Response in Opposition to Defendants' Motion to Dismiss and/or Sever (Response) (Doc. 64); Plaintiff's Response in Opposition to Defendant Ellis'

_____

[1] In this opinion, the Court references the document and page numbers designated by the electronic filing system.

Motion to Dismiss (Response/Ellis). The Court notes that Defendants Amanda Maddox and Lance Simmons, although served (Docs. 37 & 42), have not responded to the Fourth Amended Complaint.

## II.  Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. (citing <u>Twombly</u>, 550 U.S. at 556). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id</u>. (citing <u>Twombly</u>, 550 U.S. at 555).

## III.  Exhaustion of Administrative Remedies

Defendant Ellis contends that Plaintiff failed to exhaust his administrative remedies prior to filing suit regarding his claim of excessive force (Count V of the Fourth Amended Complaint) and Ellis seeks the dismissal of that claim pursuant to 42 U.S.C. § 1997e(a). Ellis' Motion at 2-7. Ellis asserts that Plaintiff "never filed *any* grievances alleging that Ellis or any other officer assaulted

2

him in May 2014." Id. at 2. See Declaration of Tammy Gibson (Doc. 51-1); Declaration of Lawanda Sanders (Doc. 51-2).

The Prison Litigation Reform Act (PLRA) requires exhaustion of available administrative remedies before a 42 U.S.C. § 1983 action with respect to prison conditions by a prisoner may be initiated in this Court. Title 42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."

Defendant Ellis bears the burden of proving a failure to exhaust available administrative remedies. Turner v. Burnside, 541 F.3d 1077, 1082-83 (11th Cir. 2008), relying on Jones v. Bock, 549 U.S. 199 (2007). In order to make this determination, guidelines are provided for reviewing a prisoner civil rights action for exhaustion compliance:

> Before a prisoner may bring a prison-conditions suit under § 1983, the Prison Litigation Reform Act of 1995 requires that he exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); see also Booth v. Churner, 532 U.S. 731, 736, 121 S.Ct. 1819, 1822, 149 L.Ed.2d 958 (2001). The purpose of the PLRA's exhaustion requirement is to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93, 126 S.Ct. 2378, 2387, 165 L.Ed.2d 368 (2006) (quotation omitted). To properly exhaust, a prisoner must "[c]ompl[y] with prison grievance procedures." Jones v. Bock, 549 U.S.

199, 218, 127 S.Ct. 910, 922–23, 166 L.Ed.2d
798 (2007).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1208 (11th
Cir. 2015).

Several factors guide the Court in reviewing the matter of
exhaustion of administrative remedies. Initially, the Court
recognizes that exhaustion of available administrative remedies is
"a precondition to an adjudication on the merits" and is mandatory
under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir.),
cert. denied, 555 U.S. 1074 (2008); Jones, 549 U.S. at 211;
Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer
left to the discretion of the district court, but is mandatory.")
(citation omitted). The Supreme Court has stated that "failure to
exhaust is an affirmative defense under the PLRA[.]" Jones, 549
U.S. at 216. Although, "the PLRA exhaustion requirement is not
jurisdictional[,]" Woodford, 548 U.S. at 101, "exhaustion is
mandatory under the PLRA[;]" therefore, "unexhausted claims cannot
be brought." Pavao v. Sims, No. 15-11790, 2017 WL 540989, at * 3
(11th Cir. Feb. 10, 2017) (per curiam) (citation omitted).

This Court explained,

> "The only limit to § 1997e(a)'s mandate is the
> one baked into its text: An inmate need
> exhaust only such administrative remedies as
> are 'available.'" 136 S. Ct. 1850, 1862
> (2016). For an administrative remedy to be
> available, the "remedy must be 'capable of use
> for the accomplishment of [its] purpose.'"
> Turner v. Burnside, 541 F.3d 1077, 1084 (11th

4

Cir. 2008) (quoting <u>Goebert v. Lee Cty</u>., 510
F.3d 1312, 1322-23 (11th Cir. 2007)).

> In <u>Ross</u>,[2] the Supreme Court identified
> three circumstances in which administrative
> remedies would be considered unavailable.
> First, "an administrative procedure is
> unavailable when (despite what regulations or
> guidance materials may promise) it operates as
> a simple dead end—with officers unable or
> consistently unwilling to provide any relief
> to aggrieved inmates." 136 S. Ct. at 1859.
> Second, "an administrative scheme might be so
> opaque that it becomes, practically speaking,
> incapable of use. In this situation, some
> mechanism exists to provide relief, but no
> ordinary prisoner can discern or navigate it."
> <u>Id</u>. **Third, an administrative remedy is
> unavailable "when prison administrators thwart
> inmates from taking advantage of a grievance
> process through machination,
> misrepresentation, or intimidation."** <u>Id</u>. at
> 1860.

<u>Davis v. Sec'y, Dept. of Corr.</u>, No. 3:15-CV-649-J-34JRK, 2017 WL
1885366, at *3-4 (M.D. Fla. May 9, 2017) (emphasis added).

In undertaking a review of the question of exhaustion, "[t]he
only facts pertinent to determining whether a prisoner has
satisfied the PLRA's exhaustion requirement are those that existed
when he filed his original complaint. <u>Smith v. Terry</u>, 491 F. App'x
81, 83 (11th Cir. 2012) (per curiam) (citing <u>Harris v. Garner</u>, 216
F.3d 970, 981 (11th Cir. 2000) (en banc)). Indeed, "[t]he time the
[PLRA] sets for determining whether exhaustion of administrative
remedies has occurred is *when the legal action is brought*, because
it is then that the exhaustion bar is to be applied." <u>Wheeler v.</u>

---

[2] <u>Ross v. Blake</u>, 136 S.Ct. 1850 (2016).

_Davis_, No. 5:14CV271/WS/CJK, 2017 WL 1029119, at *3 (N.D. Fla. Feb. 6, 2017) (report and recommendation) (quoting _Goebert v. Lee Cty._, 510 F.3d 1312, 1324 (11th Cir. 2007)) (emphasis in _Wheeler_), _report and recommendation adopted by_ No. 5:14CV271-WS/CJK, 2017 WL 1027035 (N.D. Fla. Mar. 16, 2017). Thus, the relevant question before this Court is whether Plaintiff properly exhausted his available administrative remedies as of July 1, 2015.

As noted by Defendant Ellis, Plaintiff was required to exhaust his administrative remedies prior to filing his lawsuit. Ellis' Motion at 2. The question of availability of the procedure goes to whether the administrative procedure was available before July 1, 2015, prior to the filing of the initial complaint. To construe the exhaustion requirement otherwise would render the PLRA "a toothless scheme." _Woodford_, 548 U.S. at 95.

Plaintiff asserts that he alleged sufficient facts in his Complaint to satisfy the exhaustion requirement, and alternatively, his failure to exhaust administrative remedies should be excused because Defendant Ellis threatened Plaintiff with further harm if Plaintiff's continued to complain about his conditions. Response/Ellis at 1. Indeed, Plaintiff contends that, through his actions, "Ellis effectively waived, or should otherwise be estopped from asserting" Plaintiff's failure to satisfy the exhaustion requirement. _Id_.

In undertaking a review concerning the exhaustion of administrative remedies, the Court must employ a two-step process:

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. See Turner, 541 F.3d at 1081. In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082-83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley, 802 F.3d at 1209.

Additionally, not only is there a recognized exhaustion requirement, "the PLRA exhaustion requirement requires proper exhaustion." Woodford, 548 U.S at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "**means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the**

7

> **issues on the merits).**" <u>Pozo</u>,[3] 286 F.3d, at 1024. . . .

<u>Id</u>. at 90 (emphasis added). As such, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" <u>Id</u>.

In order to provide context, the Court will set forth the applicable administrative remedies. The Florida Department of Corrections (FDOC) provides an internal grievance procedure for inmates, and it is set forth in Chapter 33-103, Florida Administrative Code (F.A.C.). Generally, the procedure provides a three-step grievance process. The Eleventh Circuit succinctly described this available administrative grievance procedure, including the specialized process adopted for grievances of a medical nature:

> In Florida, the grievance process consists of a three-step procedure. An inmate must first file an "informal grievance ... to the staff member who is responsible in the particular area of the problem." Fla. Admin. Code Ann. § 33-103.005(1). The second step requires the inmate file a formal grievance with the warden. <u>Id</u>. § 33-103.006(1)(a). If the inmate is unsuccessful at this point, he may submit an appeal to the Secretary of the DOC. <u>Id</u>. § 33-103.007.
>
> Medical grievances require only a two-step procedure: the inmate must file a formal grievance at the institutional level with the chief health officer. If the inmate

---

[3] <u>Pozo v. McCaughtry</u>, 286 F.3d 1022 (7th Cir.), <u>cert</u>. <u>denied</u>, 537 U.S. 949 (2002).

is unsuccessful, he may file an appeal with
the Secretary. <u>Id</u>. § 33-103.008.

<u>Kozuh v. Nichols</u>, 185 F. App'x 874, 877 (11th Cir. 2006) (per
curiam), <u>cert</u>. <u>denied</u>, 549 U.S. 1222 (2007).

A formal grievance of a medical nature can be filed at the
institutional level. F.A.C. § 33-103.008(1), Grievances of Medical
Nature. If denied, the inmate could appeal to the Office of the
Secretary. F.A.C. § 33-103.007(1). The inmate is required to
attach a copy of his formal grievance and response, except under
specified circumstances, to the appeal. F.A.C. § 33-103-007(5)(a).

Also, the FDOC provides for a filing of an emergency
grievance. By definition, an emergency grievance is "[a] grievance
of those matters which, if disposed of according to the regular
time frames, would subject the inmate to substantial risk of
personal injury or cause other serious and irreparable harm to the
inmate." F.A.C. § 33-103-002(4). An inmate may proceed directly to
this step if he is submitting an emergency grievance and he (1)
states at the beginning of Part A of Form DC1-303 that the
grievance concerns an emergency; and (2) clearly states "the reason
for not initially bringing the complaint to the attention of
institutional staff and by-passing the informal and formal
grievance steps of the institution or facility[.]" F.A.C. § 33-
103.007(6)(a)(1)-(2). The inmate must provide information or
evidence to support his claim of fear of reprisal. <u>See</u> <u>Dimanche v.
Brown</u>, 783 F.3d 1204, 1212-13 (11th Cir. 2015) (an inmate must

clearly state his reason for by-passing the required routine steps for exhausting his administrative remedies, like fear of being killed by identified, high-ranking institutional officials). The reviewer may return the grievance without action if convinced there is no valid reason within the grievance for by-passing the lower levels and finds the grievance is in non-compliance with the rules.[4] F.A.C. § 33-103.014(1)(f) ("[t]he inmate did not provide a valid reason for by-passing the previous levels of review as required or the reason provided is not acceptable.").

The record shows that Plaintiff did not file an informal grievance or a formal grievance at the institution against Defendant Ellis. In addition, he did not provide the Secretary with a copy of a formal grievance filed at the institutional level, since he never filed one at that level. The record also demonstrates that Plaintiff did not file an emergency grievance directly with the Secretary concerning the actions of Defendant Ellis. Finally, Plaintiff did not complete the two-step process with respect to his claim of deliberate indifference to his well-being and serious medical needs with regard to the actions of

---

[4] Direct grievances to the Office of the Secretary are permitted in very limited circumstances, as set forth in F.A.C. § 33-103.007(6)(a), Direct Grievances. If improperly submitted to the Secretary, the grievance is returned to the inmate, providing the reason for return and informing the inmate to resubmit his grievance at the appropriate level. Id. at 33-103.007(6)(d). It is returned without further processing. Id. at 33-103.014(1)(f).

Defendant Ellis. <u>See</u> Fourth Amended Complaint at 9. As such, "[t]here is no material conflict in the factual allegations in [Defendants'] motion and those in Plaintiff's response insofar as concerns whether Plaintiff correctly completed the [multi-step] grievance process." <u>Pavao v. Sims</u>, No. 5:13-cv233-WS, 2015 WL 1458161, at *5 (N.D. Fla. Mar. 30, 2015), <u>aff'd</u> <u>by</u> 679 F. App'x 819 (11th Cir. 2017).

Of import, Plaintiff was not required to plead exhaustion. As a result, the Complaint, Amended Complaint, Second Amended Complaint, and Third Amended Complaint were not dismissed sua sponte, and Plaintiff was given the opportunity to file a Fourth Amended Complaint after appointment of counsel to represent him. <u>See</u> Order (Doc. 18). Upon review of the Fourth Amended Complaint, the factual allegations presented do not demonstrate exhaustion through the grievance process; however, it is possible for retaliation or threats of retaliation to make administrative remedies unavailable to a prisoner:

> We conclude that a prison official's serious threats of substantial retaliation against an inmate for lodging or pursuing in good faith a grievance make the administrative remedy "unavailable," and thus lift the exhaustion requirement as to the affected parts of the process if both of these conditions are met: (1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process

11

that the inmate failed to exhaust. <u>See</u>
<u>Hemphill</u>, 380 F.3d at 688 ("The test for
deciding whether the ordinary grievance
procedures were available must be an objective
one: that is, would 'a similarly situated
individual of ordinary firmness' have deemed
them available." (citation omitted)); <u>cf</u>.
<u>Smith v. Mosley</u>, 532 F.3d 1270, 1277 (11th
Cir. 2008) (noting that an inmate claiming a
First Amendment violation based on retaliation
for a complaint about prison conditions must
show that the discipline "would likely deter a
prisoner of ordinary firmness from
complaining" (quotation marks and alteration
omitted)). The particulars of this standard
for determining the availability of
administrative remedies where a threat is
alleged can be honed against the facts of
future cases, with particular attention paid
to the special circumstances and security
needs of prisons.

<u>Turner v. Burnside</u>, 541 F.3d at 1085.

Thus, the first question before the Court is did "any
retaliation or threats of retaliation" deter Plaintiff from filing
grievances, making the administrative remedy unavailable. <u>Pavao v.</u>
<u>Sims</u>, 679 F. App'x 819, 826 (11th Cir. 2017) (per curiam). And,
secondly, was the threat one that would deter a reasonable inmate
of ordinary firmness and fortitude from pursuing his administrative
remedies and lodging grievances. <u>See</u> <u>Cole v. Sec'y Dep't of Corr.</u>,
451 F. App'x 827, 828 (11th Cir. 2011) (per curiam) (addressing
whether the threat actually deterred the inmate from lodging a
grievance or pursuing a part of the administrative process, and if
the threat was one that would deter a reasonable inmate of ordinary
firmness and fortitude).

A brief summary of the factual allegations applicable to the claims raised in the Fourth Amended Complaint will be given to provide context to Plaintiff's contention that retaliation or threats of retaliation deterred him from filing grievances, making the FDOC grievance process unavailable. Plaintiff alleges the following. He is a death row inmate confined at FSP and his treatment and housing differs from similarly situated death row prisoners at FSP. Fourth Amended Complaint at 6. In particular, he is housed in a cell built and designated as a disciplinary confinement cell, even though Plaintiff had not been found guilty of a disciplinary infraction. Id. Plaintiff file a grievance concerning his housing conditions being different from other death row prisoners and received a response that it was due to his conviction for which he was sentenced to death. Id. Plaintiff was told in the response to the grievance that he is on "heightened security" (HS) status. Id. at 6-7. Plaintiff states that this particular status is not referenced in the Florida Administrative Code for Inmate Treatment Directive. Id. at 7. Plaintiff describes this status as "quasi-punitive," and created to punish the inmate rather than adopted for valid security concerns. Id.

On or about February 13, 2013, after having almost two-years of the contact visitation allowed for death row inmates, Plaintiff visitation privileges were removed and Plaintiff was placed on non-contact status. Id. This was done without notification,

memorandum or hearing. Id. Eventually, Plaintiff was told by Defendant Maddox, upon inquiry, that the visitation status change was implemented by Defendant Palmer due to security concerns. Id. When Plaintiff saw Defendant Palmer during a walk-through, Plaintiff asked why he had been placed on non-contact status, and Defendant Palmer responded that "you were told you would suffer consequences for your actions." Id. Plaintiff states that the Defendants placed him on non-contact status in retaliation for Plaintiff filing grievances and the placement was imposed without any due process. Id.

Plaintiff is not permitted to participate in outdoor recreation like similarly situated prisoners. Id. Instead, when he is granted outdoor exercise, it is confined to an outdoor cage isolated from other prisoners. Id. The exercise cage is 10 by 15 feet. Id. at 8. The other similarly situated death row inmates exercise in a bigger, open yard, and they are afforded approximately six hours per week of communal outdoor recreation, meted out in two three-hour sessions. Id. Defendant Palmer punished Plaintiff with the HS quasi-punitive status. Id.

On May 21, 2014, Plaintiff Hall was returned to his cell by Defendants Simmons and Ellis, corrections officers at FSP. Id. Once in the cell, the officers instructed Plaintiff to walk backward towards the cuff port and extend his arms out of the opening with his palms facing upwards. Id. Defendants Simmons and

14

Ellis grabbed Plaintiff's arms, yanking them through the port opening. Id. Defendants then beat Plaintiff's arms, hands, and wrist with a metal object. Id. During the beating, Ellis said: "this is what happens when you do not do what you are told to do." Id.

On May 22, 2014, Plaintiff requested medical attention due to extreme pain in his left hand and wrist. Id. He was evaluated by a nurse who noted severe swelling in his hand and a lump protruding from his wrist. Id. The nurse told Plaintiff that he would be placed on the list to be evaluated by a doctor. Id. On May 23, 2014, Plaintiff again requested to be evaluated by a nurse due to continued pain. Id. at 9. The nurse told Plaintiff that he was on the list to be evaluated by a doctor. Id. On June 10, 2014, Defendant Ellis confronted Plaintiff about his seeking medical care, and Ellis told Plaintiff that it would be in his best interest to stop writing grievances or things could get much worse. Id. In fear for his well-being, Plaintiff did not file any more grievances or seek medical attention for his injured wrist. Id. Defendant Palmer approved Defendants Simmons and Ellis' actions. Id.

Defendant Jones was aware of these unlawful conditions and treatment through Plaintiff's numerous grievances, but continued to encourage and approve these conditions and treatment. Id. Defendants have failed to provide Plaintiff with any meaningful

justification or explanation for the deprivation of privileges and confinement in this new form of disciplinary confinement, HS, as well as the restrictions on outdoor exercise privileges.  <u>Id</u>. at 9-10.

Plaintiff claims he was subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments in Count V, Cruel and Unusual Punishment - Excessive Force (Defendants Simmons & Ellis).  <u>Id</u>. at 13.  Plaintiff asserts that Defendant Ellis used excessive force on May 21, 2014, by yanking Plaintiff's hands behind him and beating Plaintiff's arms, hands, and wrist with a metal object.  <u>Id</u>. at 14.  Plaintiff contends there was no penological justification for the excessive use of force, and this unprovoked conduct caused Plaintiff permanent injury to his left wrist.  <u>Id</u>.

The first question before the Court is did any retaliation or threats of retaliation actually deter Plaintiff from lodging a grievance.  Of note, Plaintiff states he was placed in a quasi-punitive status as punishment rather than for valid security concerns.  Plaintiff grieved the matter and was told he had been placed on HS.  Defendant Palmer added the denial of contact visitation after two-years of contact visitation without incident or disciplinary infractions.  When Plaintiff inquired of Defendant Palmer as to the reason for this non-contact status, Defendant Palmer said Plaintiff was told he would suffer consequences for his

actions.  Plaintiff claims the imposition of non-contact visitation was a retaliatory action taken in response to Plaintiff filing grievances.

After what has been described as this initial retaliatory action, Plaintiff claims Defendants Simmons and Ellis also retaliated against him.  They entered his cell, told him to cooperate with handcuffing procedures, and then yanked his arms through the port opening and beat his arms, hands, and wrist with a metal object.  Ellis then verbalized a threat, stating "this is what happens when you do not do what you are told to do."  Fourth Amended Complaint at 8.  When Plaintiff requested medical attention on May 22, 2014 and May 23, 2014 and spoke with nurses, Plaintiff was told he had been placed on a list to be evaluated by a doctor. When Plaintiff had still not seen a doctor on June 10, 2014, Defendant Ellis confronted Plaintiff about his asking to see a doctor, and Ellis told Plaintiff it would be in his best interest to stop writing grievances or things could get much worse.  Id. at 9.

Plaintiff references two retaliatory actions and three verbal threats of retaliation.  The question remains as to whether these events deterred Plaintiff from filing grievances.  Plaintiff states that Defendant Ellis's retaliatory actions of using excessive force and threatening further abuse were successful in intimidating Plaintiff to the point where he did not pursue exhaustion of his

administrative remedies although he did attempt to seek medical help by requesting medical attention. Response/Ellis at 11. However, he stopped seeking medical attention when additional threats were made.

The remaining question is whether the retaliation and threat of retaliation is such that it would deter a reasonable inmate of ordinary firmness and fortitude from pursuing his administrative remedies by lodging grievances. Plaintiff references several retaliatory acts and verbal threats which he claims served to intimidate him. He particularly relies on the factual allegation that he was beaten by Defendants Simmons and Ellis and was told by Ellis that this was done because Plaintiff did not do what he was supposed to do, and that, later on, he was verbally threatened by Defendant Ellis not to grieve matters and seek medical attention.[5]

The Court concludes that Plaintiff does claim that "a serious threat of substantial retaliation was made or, moreover, that any threat was made in the present context." Cole, 451 F. App'x at 828. To counter Defendants' assertion that Plaintiff failed to exhaust his administrative remedies, Plaintiff claims he was intimidated into not pursuing formal grievances and retaliated against for attempting to pursue administrative relief or question his conditions of confinement in HS. See Kaba v. Stepp, 458 F.3d

---

[5] Also of note, Plaintiff apparently did not receive timely medical attention by a doctor even though the nurses said they had referred Plaintiff to a doctor for his swollen wrist.

18

678, 686-87 (7th Cir. 2006) (asserting the administrative process "became actually unavailable" at some point before or after the attack in Kaba's cell).

Under these circumstances, the Court concludes that Defendant Ellis' Motion to Dismiss for failure to exhaust administrative remedies, a matter in abatement, is due to be denied as questions remain "about the availability of the grievance system" for Plaintiff due to alleged retaliatory acts and serious threats of retaliation against Plaintiff. See Kaba, 458 F.3d at 686.

## IV. Supervisory Liability

Defendants Gay (Classification Supervisor for FSP), Jones (the Secretary of the FDOC), and McClellan (Assistant Warden of Programs for FSP) assert that they must be dismissed. Defendants' Motion at 2. These Defendants contend that the only factual allegation raised against them is that Jones was put on notice by Plaintiff's grievances. Id. at 3.

Plaintiff states that he names Jones because she was responsible for promulgating and implementing FDOC policies, practices, procedures, or customs providing for the determination of inmate classification and overall care of prisoners. Fourth Amended Complaint at 4-5. Plaintiff names McClellan as a defendant, stating that he is responsible for ensuring that adequate policies, procedures, guidelines and regulations exist in order to properly implement the administration of confinement,

19

outdoor recreation and contact visitation for death row prisoners at FSP. Id. at 5. Finally, Plaintiff names Gay as a defendant, asserting that as a Classification Supervisor, she is a member of the Inmate Classification Team, a team that determines which inmates will be eligible for visitation, selected for a particular condition of confinement, and allowed to partake in recreation periods or whether they will be restricted, and for how long they will be restricted. Id. at 5.

Of import, these Defendants are named in their individual and official capacities. Id. at 1. Plaintiff alleges that Defendant Jones was aware of the conditions and treatment of inmates confined in HS status, but she continues "to encourage and approve these conditions and treatment." Id. at 9. Plaintiff also alleges that these Defendants have not provided Plaintiff "with any meaningful justification or other explanation for the deprivation of privileges and confinement in this new form of disciplinary confinement[.]" Id. Id. at 9-10.

In Count I, Plaintiff alleges that these Defendants knew or should have known about the conditions Plaintiff has been subjected to under HS. Id. at 10. Plaintiff also contends that these Defendants knew that Plaintiff made positive adjustment to death row confinement, not incurring any serious disciplinary reports. Id. Finally, Plaintiff states that these Defendants "have failed

to remove or instruct others to remove Plaintiff Hall from HS." Id.

In Count II, Plaintiff contends the Defendants have failed to provide periodic review of Plaintiff's HS status and they are the persons responsible for promulgating and implementing policies, practices, procedures, or customs for providing the determination of inmate classification and the overall care of inmates. Id. at 11. Finally, Plaintiff states these Defendants promulgated or implemented a policy, practice, or custom of placing Plaintiff on HS, a disciplinary-type confinement, without affording Plaintiff the minimum requirements of procedural due process. Id. at 11-12.

In Count III, Plaintiff alleges that these Defendants persistently failed to provide periodic review of Plaintiff's visitation rights, and failed to provide Plaintiff with any reason for disallowing contact visits. Id. at 12. Again, Plaintiff states that these Defendants were responsible for promulgating and implementing the policies, practices, procedures, or customs with regard to inmate classification and inmate care. Id. Additionally, Plaintiff alleges that they promulgated or implemented a policy, practice, or custom of depriving Plaintiff of his limited liberty interest in visitation rights without providing minimum process. Id. at 13.

In Count IV, Plaintiff asserts that he faces continued restriction of his terms of confinement and outdoor recreational privileges at FSP, and these Defendants are named because Plaintiff

is seeking a declaratory judgment stating that the policies, practices and customs are unlawful and Defendants actions should be enjoined. Id.

Under his prayer for relief, Plaintiff seeks an injunction requiring that he be permitted the same confinement, contact visitation and outdoor recreational privileges as other similarly situated prisoners, and monetary damages. Id. at 14. He also seeks any equitable relief deemed just and proper, reasonable attorneys' fees, costs, and litigation expenses. Id.

There is a rigorous standard for establishing supervisory liability in a civil rights action:

> "Supervisory liability under section 1983 may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation." Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988) (per curiam). Personal participation occurs when, for example, the supervisor inflicts the injury himself. See Hewett v. Jarrard, 786 F.2d 1080, 1087 (11th Cir. 1986). A causal connection can be established "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Mercado v. City of Orlando, 407 F.3d 1152, 1158 (11th Cir. 2005) (quotation omitted). This standard is quite rigorous. Id.

Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016). Plaintiff states that Defendant Gay personally participated in constitutional violations as a team member. Also, Plaintiff claims supervisory

liability on the part of Gay, Jones, and McClellan. Keeping in mind this strict limitation on supervisory liability, the Court recognizes that the Defendants may not be held liable under a theory of respondeat superior. See Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998) (finding supervisory liability requires something more than stating a claim of liability under a theory of respondeat superior).

Plaintiff, in the Fourth Amended Complaint, contends that there is a causal connection between the Defendants' actions or inactions and the alleged federal constitutional deprivation. The question is whether Plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. In order to make this determination, there are several factors to be considered.

First, "[a] policy is a decision that is officially adopted by the [government entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted), cert. denied, 522 U.S. 1075 (1998). Liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers." City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986)).

A supervisor/policymaker might officially adopt a policy that permits a particular constitutional violation, or, is some cases, a plaintiff may demonstrate that there is a custom or practice of permitting a constitutional violation. See Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1330 (11th Cir. 2003); McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit defines "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489. In order to establish liability, there must be a direct causal link between the policy or custom and the alleged constitutional deprivation. Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

Second, a question arises as to whether Plaintiff has sufficiently alleged a causal connection between the actions of these Defendants and the alleged constitutional deprivation. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). A necessary causal connection can be established if: (1) the supervisor knew about and failed to correct a widespread history of abuse; or (2) the supervisor's custom or policy resulted in a

constitutional violation; or (3a) the supervisor directed the subordinate to act unlawfully; or (3b) the supervisor knew that the subordinate would act unlawfully and failed to stop him from acting unlawfully. Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014); Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). But, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Id. at 1360-61 (internal quotation marks omitted and citation omitted).

Plaintiff contends that Defendants Jones, Gay, and McClellan implemented a policy or custom of placing Plaintiff on HS, a disciplinary-type confinement, without affording him the minimum requirements of procedural due process; the Defendants knew or should have known about the conditions Plaintiff has been subjected to under HS and they failed to remove or instruct others to remove him from HS; and the Defendants were responsible for promulgating and implementing the policies, practices, procedures, or customs with regard to inmate classification and inmate care, and they promulgated or implemented a policy, practice, or custom of depriving Plaintiff of his limited liberty interest in visitation rights without providing minimum process.

It is important to recognize that "[a] policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented 'with deliberate indifference as to

its known or obvious consequences.'" <u>Fields v. Corizon Health,</u>
<u>Inc.</u>, 490 F. App'x 174, 182 (11th Cir. 2012) (per curiam) (quoting
<u>McDowell</u>, 392 F.3d at 1291). Here, Plaintiff alleges that
Defendants adopted policies, practices, or customs that subjected
him to unconstitutional conditions of confinement and deprived him
of his liberty interests.

The Eleventh Circuit has provided guidance for this Court's
review:

> We do not recognize vicarious liability,
> including respondeat superior, in § 1983
> actions. <u>Cottone</u>, 326 F.3d at 1360. In order
> to establish that a defendant committed a
> constitutional violation in his supervisory
> capacity, a plaintiff must show that the
> defendant instituted a "custom or policy
> [that] result[s] in deliberate indifference to
> constitutional rights or ... directed [his]
> subordinates to act unlawfully or knew that
> the subordinates would act unlawfully and
> failed to stop them from doing so." <u>West v.</u>
> <u>Tillman</u>, 496 F.3d 1321, 1328-29 (11th
> Cir.2007) (per curiam) (first and second
> alterations in original) (internal quotation
> marks omitted) (quoting <u>Cottone</u>, 326 F.3d at
> 1360).
>
> As we have explained, "[a] policy is a
> decision that is officially adopted by the
> municipality, or created by an official of
> such rank that he or she could be said to be
> acting on behalf of the municipality." <u>Sewell</u>
> <u>v. Town of Lake Hamilton</u>, 117 F.3d 488, 489
> (11th Cir. 1997). A custom is an unwritten
> practice that is applied consistently enough
> to have the same effect as a policy with the
> force of law. <u>City of St. Louis v. Praprotnik</u>,
> 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99
> L.Ed.2d 107 (1988). Demonstrating a policy or
> custom requires "show[ing] a persistent and
> wide-spread practice." <u>Depew v. City of St.</u>

> Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir.
> 1986).

Goebert v. Lee Cty., 510 F.3d 1312, 1331–32 (11th Cir. 2007).

McClellan, an assistant warden, as well as each warden of FSP, is "charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations[.]" Mathews v. Crosby, 480 F.3d 1265, 1275 (11th Cir. 2007), cert. denied, 552 U.S. 1095 (2008). Jones, the Secretary, is the head of the corrections institution, and she is charged with setting Department policy. See id. at 1275-76. Gay, the Classification Supervisor and a member of the Inmate Classification Team, allegedly determines which inmates will be eligible for visitation, selected for a particular condition of confinement, and allowed to partake in recreation periods or whether they will be restricted, and for how long they will be restricted. Thus, in this case, Defendants Jones, McClellan and Gay could face liability under section 1983 predicated on a showing of the adoption of customs or policies deliberately indifferent to a substantial risk of serious harm and/or in violation of a protected liberty interest, and Defendant Gay could face liability under section 1983 predicated on a showing that she, as the Classification Supervisor and team member, personally participated in the acts that comprise the constitutional violations.

Plaintiff has pled enough facts in the Fourth Amended Complaint to state a claim to relief that is plausible on its face

against Defendants Jones, Gay, and McClellan. He has set forth
sufficient allegations supporting his contention that there is a
causal connection between the Defendants' actions or inactions and
the alleged federal constitutional deprivations. Therefore, the
Defendants' Motion is not due to be granted in this regard.

### V. Eighth Amendment Violation

Respondents assert that Plaintiff's conditions of confinement
with regard to housing status, visitation, and recreation did not
violate his Eighth Amendment rights. Defendants' Motion at 5-8.
Defendants assert that Plaintiff's description of his conditions of
confinement do not demonstrate an infliction of pain "without any
penological purpose" or an "unquestioned and serious deprivation of
basic human needs" such as medical care, exercise, food, warmth,
clothing, shelter, or safety. Rhodes v. Chapman, 452 U.S. 337, 347
(1981). They also refer to the two-part analysis governing an
Eighth Amendment challenge to conditions of confinement.
Defendants' Motion at 6-8. In doing so, Defendants rely on the
guidance provided by the Eleventh Circuit in Chandler v. Crosby,
379 F.3d 1278, 1288-89 (11th Cir. 2004). Defendants' Motion at 5.

In Chandler, the Eleventh Circuit addressed a prison
conditions complaint and said:

> The Eighth Amendment to the United States
> Constitution states: "Excessive bail shall not
> be required, nor excessive fines imposed, nor
> cruel and unusual punishments inflicted." The
> "cruel and unusual punishments" standard
> applies to the conditions of a prisoner's

28

confinement.  Rhodes v. Chapman, 452 U.S. 337,
345-46, 101 S.Ct. 2392, 2398-99, 69 L.Ed.2d 59
(1981).   While "the primary concern of the
drafters was to proscribe tortures and other
barbarous methods of punishment," the Supreme
Court's "more recent cases [show that] [t]he
[Eighth] Amendment embodies broad and
idealistic concepts of dignity, civilized
standards, humanity, and decency." Estelle v.
Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290,
50 L.Ed.2d 251 (1976) (marks, citations, and
brackets omitted).  "No static test can exist
by which courts determine whether conditions
of confinement are cruel and unusual, for the
Eighth Amendment must draw its meaning from
the evolving standards of decency that mark
the progress of a maturing society." Rhodes,
452 U.S. at 346, 101 S.Ct. at 2399 (marks and
citation omitted).

        Even so, "the Constitution does not
mandate comfortable prisons." Id. at 349, 101
S.Ct. at 2400.   If prison conditions are
merely "restrictive and even harsh, they are
part of the penalty that criminal offenders
pay for their offenses against society." Id.
at 347, 101 S.Ct. at 2399.   Generally
speaking, prison conditions rise to the level
of an Eighth Amendment violation only when
they "involve the wanton and unnecessary
infliction of pain." Id.

Chandler, 379 F.3d at 1288-89 (footnote omitted).

    Plaintiff is an inmate confined at FSP, a high security
institution.  He is confined on death row.  In order to establish
an Eighth Amendment conditions of confinement claim, he must
demonstrate that a prison official was deliberately indifferent to
a substantial risk of serious harm to him.  Bennett v. Chitwood,
519 F. App'x 569, 573 (11th Cir. 2013) (per curiam) (citing Farmer
v. Brennan, 511 U.S. 825, 832-33 (1994)).  To make this showing, he

must meet both the objective and subjective components to the deliberate-indifference test. Id. (citing Farmer, 511 U.S. at 834).

To satisfy the objective, "substantial risk of serious harm" component, a plaintiff "must show a deprivation that is, 'objectively, sufficiently serious,' which means that the defendants' actions resulted in the denial of the minimal civilized measure of life's necessities." Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996). "The challenged condition must be 'extreme'": the prisoner must show that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). In evaluating an Eighth Amendment claim, we consider both the "severity" and the "duration" of the prisoner's exposure to extreme temperatures. Id. at 1295. Merely showing that prison conditions are uncomfortable is not enough. Id. at 1289.

For the subjective component, the prison official must (1) have subjective knowledge of the risk of serious harm, and (2) nevertheless fail to respond reasonably to the risk. Farmer, 511 U.S. at 837, 114 S.Ct. at 1979. Subjective knowledge on the part of the prison official requires that the official was aware of the facts "from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official actually drew that inference. Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008). A prison official must have a sufficiently culpable state of mind to be deliberately indifferent. Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003). "[T]he evidence must demonstrate that with knowledge of the

> infirm conditions, the official knowingly or
> recklessly declined to take actions that would
> have improved the conditions." Thomas v.
> Bryant, 614 F.3d 1288, 1312 (11th Cir. 2010)
> (alteration and quotation omitted). Mistakes
> and even negligence on the part of prison
> officials are not enough for a constitutional
> violation. Crosby, 379 F.3d at 1289.

Id. at 574.

Defendants contend that Plaintiff fails to meet the objective component because he complains about inconvenience and mere discomfort. Defendants' Motion at 7. Further, Defendants assert that Plaintiff does not complain of a deprivation of any human need. Id. Defendants contend that the allegations are not sufficiently serious to implicate the Eighth Amendment. Id. at 8.

With regard to the subjective component of the two-pronged test, Defendants assert that Plaintiff has not demonstrated that the Defendants had knowledge of these conditions, except Plaintiff spoke to Warden Palmer about his non-contact visitation restriction, but this restriction is not sufficiently serious to amount to an Eighth Amendment violation. Id. at 8.

The conditions of Plaintiff's confinement should not inflict unnecessary pain or suffering, "totally without penological justification," resulting "in the gratuitous infliction of suffering." Gregg v. Ga., 428 U.S. 153, 183 (1976). Of import, Eighth Amendment violations are not confined to that which would have been considered to be cruel and unusual "by the framers."

Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999). This Court must look to the "contemporary standards of decency." Ford v. Wainwright, 477 U.S. 399, 406 (1986). Indeed, there is "no static test." Chandler v. Baird, 926 F.2d 1057, 1064 (11th Cir. 1991) (citation and internal quotation marks omitted). The standard in the prison context is whether the prison officials violate the Eighth Amendment "through 'the unnecessary and wanton infliction of pain.'" Bass, 170 F.3d at 1316 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

Plaintiff complains that the prison officials have, through their actions, subjected him to solitary confinement in his cell almost twenty-four hours a day, with sporadic out-of-cell recreation, without human contact, except with prison officials. Response at 11. Since Plaintiff must exercise in a cage, segregated from the other death row inmates on the exercise yard, he is not allowed human interaction when he does receive sporadic outside exercise. Also, his limited human interaction of contact visits has also been taken away for many years, although he has been allowed no-contact visitation. Of note, Plaintiff is confined in a disciplinary-type cell, although he has not been convicted of a disciplinary infraction, until just recently. Plaintiff has been confined in this HS status for nearly seven years. Id.

"Although solitary confinement, as a mode of punishment, is not per se cruel and unusual, there are constitutional boundaries

to its use." Gates v. Collier, 501 F.2d 1291, 1304 (5th Cir. 1974).[6]   It is important to recognize that when solitary confinement conditions become so severe, the value as a viable prisoner disciplinary tool diminishes and the confinement becomes cruel and unusual punishment.  Id.

In this case, Plaintiff claims he is being punished as he has been confined in this severely restricted status for almost seven years, although he has not committed a disciplinary infraction while on death row to deserve such punishment.  It has been recognized that in order to be an effective penological tool, solitary confinement should be used sparingly, as a measure of last resort to induce compliance with prison regulations, and solitary confinement has passed muster under the Eighth Amendment when it is shown that it is reserved for recalcitrant, incorrigible inmates, and there is an institutional need to preserve order and prevent chaos.  See Novak v. Beto, 320 F.Supp. 1206, 1212 (S.D. Texas 1970), aff'd in part, rev'd in part by Novak v. Beto, 453 F.2d 661, 671 (5th Cir. 1971).  It is also notable that solitary confinement conditions have been condemned as violative of the Eighth Amendment when they are unsanitary, degrading, and lengthy.  Id. at 1211-12.

Of course, prison authorities' decisions must be given great weight when they are determining how best to operate a detention

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

facility, especially when the issue is internal security of a maximum correctional institution like FSP. Sheley v. Dugger, 833 F.2d 1420, 1423 (11th Cir. 1987) (per curiam). The Supreme Court has cautioned, however, that the length of solitary confinement and extreme isolation should not be ignored when addressing constitutional standards. Hutto v. Finney, 437 U.S. 678, 686 (1978); Rhodes v. Chapman, 452 U.S. 337, 346 (1981).

The question of physical and mental deterioration as the result of alleged punitive and lengthy segregation is a serious one and cannot be summarily dismissed. Recently, justices of the Supreme Court of the United States have questioned the human toll wrought by years of solitary confinement and whether this type of isolation can survive constitutional scrutiny. See Davis v. Ayala, 135 S.Ct. 2187, 2208-09 (2015) (Kennedy, J., concurring); Ruiz v. Texas, 137 S.Ct. 1246, 1247 (2017) (Breyer, J., dissenting). Indeed, courts have struggled with "the many issues solitary confinement presents[,]" recognizing that solitary imposed as a temporary state of confinement "is a useful or necessary means to impose discipline and to protect prison employees and other inmates[,]" while acknowledging that "[y]ears on end of near-total isolation exact a terrible price." Davis v. Ayala, 135 S.Ct. at 2210 (Kennedy, J., concurring).

It is important to note that an inmate may bring an Eighth Amendment challenge to a condition that is currently impacting him,

or is "substantially likely to occur in the future – a substantial risk of serious harm." Braggs v. Dunn, No. 2:14cv601-MHT (WO), 2017 WL 2773833, at *10 (M.D. Ala. June 27, 2017) (addressing the profound impact of solitary confinement on prisoners' mental health, particularly on those already deemed mentally ill).

Defendants ask this Court to analyze Plaintiff's Eighth Amendment claim using the deliberate indifference test, referencing the objective and subjective components set forth in Farmer and utilized in Chandler when this Court addressed Eighth Amendment claims regarding heat and ventilation at Union Correctional Institution in a bench trial. Of import, this case is not yet at the trial state, nor is it even at the summary judgment stage. On the contrary, this case is before the Court on a motion to dismiss. Therefore, the only question before the Court is whether the claims have facial plausibility.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted).

Plaintiff has certainly "nudged [his] claims across the line from conceivable to plausible[.]" Twombly, 550 U.S. at 570. He has presented allegations sufficient to give rise to an Eighth Amendment claim concerning the conditions of his confinement. In his Fourth Amended Complaint, Plaintiff has adequately presented a claim of an Eighth Amendment violation without penological justification, subjecting Plaintiff to the unnecessary and wanton infliction of pain.

More specifically, Plaintiff has adequately alleged that these Defendants were aware that Plaintiff faced a substantial risk of harm by being confined on HS solitary confinement status, with all of its restrictions on human contact and exercise, for years on end. When conditions are so severe and are so lengthy, they arguably lose there viability as a disciplinary or management tool. Again, as previously noted, severe restrictions should be used sparingly, as a last resort to induce compliance with the rules of conduct and to prevent disorder and chaos.

Of note, Plaintiff states that he had contact visitation while on death row for two years, apparently without incident, but non-contact visitation was abruptly implemented, without notice and without any institutional infractions by the Plaintiff. He has been held in solitary confinement, with severe restrictions on human contact for years on end, without disciplinary infractions on his part or any participation in actions constituting disorder or

presenting chaos. These factors certainly support a claim that there is a serious toll on the mental health and well-being of inmate confined in solitary for years-on-end, and a risk of serious harm in the future as a consequence of being held on extreme isolated confinement conditions for multiple years. Plaintiff has alleged enough facts to state a claim to relief that is plausible on its face.

Defendants' argument would more properly be raised in a Rule 56 motion with supporting records, affidavits, and other relevant documents. Indeed, when the Defendants file their motions for summary judgment, they are directed to state with particularity the supporting evidentiary basis for granting summary disposition of this case. The Court need not scour the record and review all evidentiary materials on file when reviewing a motion for summary disposition; instead, the Court need ensure that the motion itself is supported by the appropriate evidentiary materials. <u>Reese v. Herbert</u>, 527 F.3d 1253, 1269 (11th Cir. 2008) (citing <u>United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida</u>, 363 F.3d 1099, 1101-02 (11th Cir. 2004)).

## VI. Fourteenth Amendment Violation

Defendants, in their Motion, contend that Plaintiff has not alleged sufficient facts demonstrating a violation of a protected liberty interest in violation of his constitutional right to due process of law. Defendants' Motion at 8. Plaintiff states that he

retains a limited liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment; "[a]dmittedly, prisoners do not shed all constitutional rights at the prison gate[.]" <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995) (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 555 (1974)).

The Supreme Court addressed the issue of what process the Fourteenth Amendment requires to be afforded to inmates before assigning them to a high security "Supermax" facility:

> The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake. A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," <u>see</u>, <u>e.g.</u>, <u>Vitek v. Jones</u>, 445 U.S. 480, 493-494, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution), or it may arise from an expectation or interest created by state laws or policies, <u>see</u>, <u>e.g.</u>, <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556-558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (liberty interest in avoiding withdrawal of state-created system of good-time credits).

> We have held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement. <u>Meachum v. Fano</u>, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose"). We have also held, however, that a liberty interest in avoiding particular

> conditions of confinement may arise from state
> policies or regulations, subject to the
> important limitations set forth in <u>Sandin v.
> Conner</u>, 515 U.S. 472, 115 S.Ct. 2293, 132
> L.Ed.2d 418 (1995).

<u>Wilkinson v. Austin</u>, 545 U.S. 209, 221-22 (2005).

As noted in <u>Sandin</u>, discipline in segregated confinement, for a limited period of thirty days, does not "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." <u>Sandin</u>, 515 U.S. at 486. Also of import, in <u>Sandin</u>, the conditions of disciplinary segregation mirrored that of administrative segregation and protective custody with very minor exceptions. <u>Id</u>. Finally, even general population inmates in that particular institution spent significant amounts of time in lock-down. <u>Id</u>. Thus, there was no "major disruption" in the inmate's environment when confined in disciplinary segregation. <u>Id</u>. As a consequence, the Supreme Court concluded that the prisoner did not have a protected liberty interest, either based on the prison regulations or the Due Process Clause itself, that would entitle the prisoner to the procedural requirements set forth in <u>Wolff</u>, and the misconduct hearing was sufficient for "[t]he regime to which he was subjected[.]" <u>Sandin</u>, 515 U.S. at 487.

In this regard, the Court looks to "the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" <u>Austin</u>, 545 U.S. at 223 (quoting <u>Sandin</u>, 515 U.S. at

484). In <u>Austin</u>, the Court concluded that the conditions in the "Supermax" facility imposed "an atypical and significant hardship under any plausible baseline[,]" <u>id</u>. at 223, noting that almost all human contact is prohibited, lights are on 24-hours per day, exercise takes place in a small indoor room, it is an indefinite placement (with an initial 30-day review, and then annually) in a Supermax facility, and the placement disqualifies the individual from parole eligibility. <u>Id</u>. at 223-24. Of further import, the conditions at the Supermax facility are more restrictive than death row in Ohio prisons. <u>Id</u>. at 214.

The Supreme Court concluded that, in combination, these conditions impose an atypical and significant hardship "within the correctional context." <u>Id</u>. at 224. Thus, the Supreme Court found there is a liberty interest in avoiding assignment to the Supermax facility. <u>Id</u>.

Here, Plaintiff alleges that he is confined on death row at a maximum security institution, but he is also confined on HS status on death row. In this status, he is confined in a disciplinary-type cell almost 24 hours per day; he receives sporadic out-of-cell recreation in a cage, without human contact; unlike other death row inmates, he is not allowed to receive contact visits; and this HS status has continued for over six years. Like the Supermax facility described in <u>Austin</u>, almost all human contact is prohibited on FSP's HS status and there is no finite placement on

this status, but rather, the status goes on for years, without real hope for a lifting of the restricted confinement because it is apparently based on the offense for which the inmate is incarcerated, not on the inmate's behavior once confined on death row.

Three distinct factors are considered when considering a due process claim of this nature:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e.g., Goldberg v. Kelly, supra, 397 U.S., at 263-271, 90 S.Ct., at 1018-1022.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). This framework for evaluation outlined in Mathews is reiterated in Austin, 545 U.S. at 224-25.

Plaintiff has described conditions which, taken together, may impose an atypical and significant hardship within the corrections context, that is, a liberty interest in avoiding being assigned to HS status. In his Fourth Amended Complaint, Plaintiff has alleged enough facts to state a claim to relief that is plausible on its face. He has set forth sufficient factual matter to support the conclusion that he has a liberty interest and could bear out a claim of a Fourteenth Amendment violation against Defendants.

Plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Therefore, Defendants' Motion is due to be denied, and the parties will be given an opportunity to further develop the facts.

## VII.  Lack of Physical Injury

Defendants assert that Plaintiff cannot recover compensatory and punitive damages due to the lack of physical injury. Defendants' Motion at 10 -13.  Plaintiff asserts, that in light of his allegations of being confined on HS for over six years, he is not barred from seeking compensatory or nominal damages.  Response at 18-19.  It is important to note that Plaintiff is not seeking punitive damages; therefore, that issue will not be addressed by the Court.  Id. at 18.

Based on the allegations contained in the Fourth Amended Complaint, Plaintiff has not suffered an injury sufficient to withstand 42 U.S.C. § 1997e(e) with respect to Plaintiff's claim for compensatory damages.  In Napier v. Preslicka, 314 F.3d 528, 531-32 (11th Cir. 2002), cert. denied, 540 U.S. 1112 (2004), the Eleventh Circuit addressed the requirements of 1997e(e):

> Subsection (e) of 42 U.S.C. § 1997e states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  This statute is intended to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which

to pursue their complaints. See Harris v. Garner, 216 F.3d 970, 976-79 (11th Cir. 2000) (en banc) (surveying the legislative history of the PLRA). An action barred by § 1997e(e) is barred only during the imprisonment of the plaintiff; therefore, such action should be dismissed without prejudice by the district court, allowing the prisoner to bring his claim once released and, presumably, once the litigation cost-benefit balance is restored to normal. Id. at 980.

Tracking the language of the statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody. In Harris, we decided that the phrase "Federal civil action" means all federal claims, including constitutional claims. 216 F.3d at 984-85.

Upon review, Plaintiff is bringing a federal civil action, he is a prisoner, and he is seeking compensatory and nominal damages. Plaintiff mentions no physical injury in the Fourth Amended Complaint. Plaintiff does not refer to persistent pain or other symptoms. See Thompson v. Sec'y, Fla. Dep't of Corr., 551 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (discussing the de minimis threshold for injury).

"While § 1997e(e) precludes a prisoner from seeking compensatory or punitive damages without a prior showing of physical injury, it does not preclude a prisoner from seeking nominal damages." Hale v. Sec'y for Dep't of Corr., 345 F. App'x 489, 492 (11th Cir. 2009) (per curiam) (citing Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007)). In this case, Plaintiff specifically requests nominal damages.

43

Accordingly, Defendants' Motion is granted to the extent that Plaintiff's claim for compensatory damages will be dismissed against Defendants Jones, Gay, McClellan, and Palmer. See Kirkland v. Everglades Corr. Inst., No. 2014 WL 1333212, at * 6 (Mar. 31, 2014) (Not Reported in F.Supp.2d) (finding the only recoverable damages are nominal damages). Thus, any claim for nominal damages remains.

## VIII.  Eleventh Amendment Immunity

Defendants Jones, Gay, McClellan, and Palmer raise the defense of sovereign immunity to the extent Plaintiff is seeking monetary damages against them in their official capacities. Defendants' Motion at 13-14. To the extent Plaintiff is seeking monetary damages against the Defendants in their official capacities, the motion to dismiss is due to be granted. An official capacity claim for monetary damages is barred by sovereign immunity. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 97-102 (1984). Thus, insofar as Plaintiff seeks monetary damages from the Defendants in their official capacities, the Eleventh Amendment bars suit. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam).

Plaintiff, in his Response, states that he is seeking to recover damages against the Defendants in their individual capacities. Response at 19-20. Plaintiff named the Defendants in both their individual and official capacities in his Fourth Amended

44

Complaint. As Plaintiff named the Defendants in their individual capacities, the Defendants are not immune from suit for monetary damages under the Eleventh Amendment in their individual capacities.

## IX. Qualified Immunity

In a recent opinion, the Eleventh Circuit addressed the denial of a motion to dismiss asserting qualified immunity, an immunity not only from liability but also from suit. <u>Jones v. Fransen</u>, 857 F.3d 843, 849 (11th Cir. 2017). The Eleventh Circuit explained:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).
>
> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, 102

S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. See id. To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings. Maddox, 727 F.3d at 1120-21 (citation omitted).

Jones v. Fransen, 857 F.3d at 850-51.

Defendants Jones, Gay, McClellan, and Palmer contend they are immune from suit, claiming qualified immunity. Defendants' Motion at 14-16. Under the doctrine of qualified immunity, Defendants may claim they are entitled to qualified immunity from **monetary damages** in their individual capacities. It is undisputed that Defendants were engaged in discretionary functions during the events at issue. To defeat qualified immunity with respect to these Defendants, Plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established.

Upon review of the Fourth Amended Complaint, Plaintiff has presented sufficient allegations to present Eighth and Fourteenth Amendment claims that withstand Defendants' Motion to Dismiss, and the constitutional rights at issue were clearly established. Given the undersigned's conclusion that the Defendants' motion should be denied as to the Eighth and Fourteenth Amendment claims,[7] and based on the state of the law on qualified immunity in the Eleventh Circuit, qualified immunity should be denied as to Defendants Jones, Gay, McClellan, and Palmer.

### X. Motion to Sever

---

[7] See Gates, 501 F.2d 1291; Rhodes, 452 U.S. 337; Hutto, 437 U.S. 678; Bass, 170 F.3d 1312; Chandler v. Baird, 926 F.2d 1057; Sheley, 833 F.2d 1420; and Novak, 453 F.2d 661 with regard to the Eighth Amendment claims, and Austin, 545 U.S. 209 (relying on Sandin); Sandin, 515 U.S. 472; Wolff, 418 U.S. 539; and Bass with respect to the Fourteenth Amendment claims.

Defendants move to sever the claims against Defendants Ellis and Simmons from this action. Defendants' Motion at 16-20. According to Rule 20 of the Federal Rules of Civil Procedure concerning the permissive joinder of parties, two prerequisites for joinder must be met: (1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and (2) some question of law or fact common to all defendants will arise in the action. Malibu Media, LLC v. Does 1-28, 295 F.R.D. 527, 531 (M.D. Fla. Dec. 6, 2012).

In this regard, joinder is strongly encouraged, and the joinder rules should be construed generously and broadly. Id. at 530 (citation omitted). This Court has broad discretion to join parties or not, and when assessing the requirements of Rule 20, the factual allegations raised in the complaint must be accepted as true. Id. at 531.

Courts of this Circuit use the "logical relationship" test when determining whether the right to relief arises out of the same transaction or occurrence, or series of transactions or occurrences. Id. This is a "loose" standard, permitting "a broad realistic interpretation in the interest of avoiding a multiplicity of suits." Id. (quoting Plant v. Blazer Fin. Servs., Inc., 598 F.2d 1357, 1361 (5th Cir. 1979)). As such, this Court should inquire as to whether the same operative facts serve as the basis of both claims. Id. (quotation omitted).

In this case, there are common operative facts, logically related and directly linked to Plaintiff's complaints about the conditions of his confinement, and ultimately resulting in retaliatory actions taken by Defendants Simmons and Ellis. As a result, "the common operative facts alleged are sufficient to support joinder." Id. at 532. There is demonstrated connectivity between the actions of the corrections supervisors in allegedly adopting a custom or policy of placing an inmate in extreme solitary confinement conditions, the actual placement of Plaintiff on HS, Plaintiff's lengthy and continued detention in the restrictive conditions of HS, and the alleged retaliatory actions taken by Defendants Ellis and Simmons.

Upon review of the Fourth Amended Complaint, the Court concludes that Plaintiff has sufficiently alleged questions of law and fact common to all Defendants. Plaintiff alleges that the actions of Ellis and Simmons were undertaken in retaliation for Plaintiff's submission of grievances regarding the conditions of his confinement. Plaintiff argues for joinder, stating his complaints about his conditions on HS served as the impetus for Defendants' excessive use of force against Plaintiff on May 21, 2014, and Ellis' verbal threat to further retaliate against Plaintiff.

Rule 18 provides that a party asserting a claim may join as many claims as he has against an opposing party. Rule 18(a), Fed.

R. Civ. P. Once Rule 20 is satisfied, "Rule 18(a) of the Federal Rules of Civil Procedure grants the plaintiffs complete freedom to join in a single action all claims that they may have against any of the defendants. 6 C. Wright & A. Miller, Federal Practice and Procedure s 1582 (1971)." <u>In re Beef Indus. Antitrust Litig., MDL Dkt. No. 248</u>, 600 F.2d 1148, 1168 (5th Cir. 1979).

In light of the above, Defendants' Motion to Sever will be denied. Therefore, Defendants' request that Plaintiff be required to file a Fifth Amended Complaint excluding his claims and allegations against Ellis and Simmons is denied.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion to Dismiss and/or Sever (Doc. 35) is **GRANTED** as to Plaintiff's claim for compensatory damages, but denied with respect to Plaintiff's claim for nominal damages; **GRANTED** as to any claim for monetary relief against Defendants Jones, Gay, McClellan, and Palmer in their official capacities; and **DENIED** in all other respects.

2. Defendant Ellis' Motion to Dismiss (Doc. 51) is **DENIED**.

3. Defendants Jones, Gay, McClellan, Palmer, and Ellis shall respond to the Fourth Amended Complaint by **November 30, 2017.**

4. The Court notes that there is a sealed notice of USM-285 proof of service as to Defendant Amanda Maddox executed on September 16, 2016 (Doc. 37; S-37) and a sealed notice of USM-285

proof of service as to Lance Simmons executed on October 12, 2016 (Doc. 42; S-42). Neither Defendant has responded to the Fourth Amended Complaint and the Office of the Attorney General has not responded on their behalf or entered a notice of appearance. Erich Messenger, Assistant Attorney General, shall notify the Court if he is going to represent Defendants Maddox and Simmons by **November 9, 2017.** If he is not, he should notify the Court whether Defendants Maddox and Simmons intend to proceed pro se or if counsel has no knowledge of their intentions.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of October, 2017.

BRIAN J. DAVIS
United States District Judge

sa 10/16
c:
Counsel of Record

51