UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ENOCH DONNELL HALL,

        Plaintiff,

v.                               Case No. 3:15-cv-824-J-39JRK

JOHN PALMER, etc.; et al.,

        Defendants.

_____

## ORDER

### I. Status

Plaintiff, Enoch Donnell Hall, a death-row inmate, is proceeding on a fourth amended complaint (Doc. 22; Compl.) filed by his court-appointed counsel. Plaintiff asserts claims based on the conditions of his confinement and an alleged use of excessive force while he was housed at Florida State Prison (FSP).[1] The first four counts are against individuals the Court references collectively as "supervisory defendants": John Palmer, Warden of FSP; Jeffery McClellan, Assistant Warden of FSP; Gina Gay, Classification Supervisor of FSP; Amanda Maddox, Senior Classifications Officer of FSP; and Julie Jones, former Secretary

_____

[1] Plaintiff is now housed at Union Correctional Institution (UCI). See FDOC website, Offender Information Search, available at http://www.dc.state.fl.us/OffenderSearch/Search.aspx (last visited January 8, 2020).

of the Florida Department of Corrections (FDOC).[2] Plaintiff alleges the supervisory defendants housed him a "heightened security" cell for "multiple years" and arbitrarily restricted his recreation and visitation privileges, in violation of the Eighth and Fourteenth Amendments and contrary to the provisions of the Florida Administrative Code. See Compl. at 10-12. Count five of the complaint is against two corrections officers, Defendants Simmons and Ellis, for their alleged use of excessive force against Plaintiff on May 21, 2014. Id. at 13-14.

Before the Court are two motions for summary judgment: (1) Plaintiff's motion for partial summary judgment as to count four of his complaint in which he seeks declaratory and injunctive relief against the supervisory defendants (Doc. 86; Pl. Motion); and (2) Defendants Jones, Palmer, McClellan, Gay, Maddox, and Ellis's motion for summary judgment as to the claims against the supervisory defendants (counts one through four) (Doc. 87; Def.

---

[2] Plaintiff sues Julie Jones in her individual and official capacities as Secretary of the FDOC, a position she no longer holds. Mark S. Inch is the current Secretary of the FDOC. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mark S. Inch will be substituted as the proper party Defendant as the Secretary of the FDOC with respect to the official-capacity claim. The individual-capacity claim against Julie Jones remains.

Motion).[3] The motions are ripe for this Court's review. <u>See</u>
Responses (Doc. 92; Def. Resp.) (Doc. 93; Pl. Resp.).[4]

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a). An issue is genuine when the
evidence is such that a reasonable jury could return a verdict in
favor of the nonmovant. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93
F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville
Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere
scintilla of evidence in support of the non-moving party's
position is insufficient to defeat a motion for summary judgment."
<u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243,

---

[3] Defendant Simmons was served on October 12, 2016, but he
did not respond to the complaint. As such, the Court directed the
Clerk to enter a default against Defendant Simmons on November 7,
2018. <u>See</u> Order (Doc. 82).

[4] Except for deposition transcripts and Plaintiff's
declaration, the Court cites the parties' exhibits as "Pl. Ex."
and "Def. Ex." followed by a letter designation. The Court cites
Plaintiff's deposition transcript (Doc. 109) as "Pl. Dep.";
Plaintiff's declaration (Doc. 86-2) as "Pl. Dec."; Defendant Gay's
deposition transcript (Docs. 86-3, 86-4) as "Gay Dep."; and
Defendant Palmer's deposition transcript (Docs. 86-5, 86-6, 87-3,
87-4) as "Palmer Dep." Page numbers to deposition transcripts
reflect the internal document numbering, not those assigned by the
Court's electronic docketing system. Page numbers in all other
exhibits reference those assigned by the Court's electronic
management system (CM/ECF), which are located in the upper right
corner of each document.

1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

On summary judgment, a party opposing the motion must point to evidence in the record to demonstrate a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

When a court is presented with cross motions for summary judgment, the court must evaluate each motion separately to determine whether either party is entitled to the relief sought. In accordance with Rule 56, when evaluating the merits of each motion, the court must construe the facts in the light most favorable to the non-moving party. <u>See</u> 10A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2720 (4th ed., August 2019 update) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

### III. Plaintiff's Allegations & Claims for Relief[5]

Plaintiff sues the supervisory defendants in their individual and official capacities. He alleges the supervisory defendants

---

[5] Because Plaintiff is represented by counsel, the Court only briefly summarizes the pertinent allegations and claims against the supervisory defendants.

treated him differently than other death row inmates with respect to his cell assignment and visitation and recreation privileges. See Compl. at 6, 7. Plaintiff asserts he was arbitrarily "housed in a cell that was built for and designated as a disciplinary confinement cell for prisoners," though he had not been found guilty of any disciplinary infraction to have warranted this "heightened security" status. Id. at 6. When Plaintiff grieved the issue, he was informed his cell assignment was a result of "his conviction for which he was sentenced to death."[6] Id.

Plaintiff also asserts the supervisory defendants arbitrarily restricted his visitation and recreation privileges, which further isolated him from other inmates and visitors. Id. at 10. Plaintiff contends the collective conditions of his confinement—placement in a heightened security cell with restrictions on his ability to interact with others during recreation and visitation—amount to cruel and unusual punishment in violation of the Eighth Amendment (count one). Id. Additionally, he contends the restrictions on his visitation and recreation privileges violate the Fourteenth Amendment due process clause (counts two and three). Id. at 11, 12.

---

[6] Plaintiff was sentenced to death on January 15, 2010, for the murder of a corrections officer. See Pl. Motion at 4. See also Florida Department of Corrections website, available at http://www.dc.state.fl.us/OffenderSearch/Search.aspx (last visited January 8, 2020).

In a separately numbered count (four), which Plaintiff characterizes as a "claim," he sets forth his requests for declaratory and injunctive relief against the supervisory defendants. Id. at 13. In count four, Plaintiff asserts he faces "the continuing violation of his limited rights afforded to him regarding the terms of his confinement" unless declaratory and injunctive relief are not granted. Id. In addition to declaratory and injunctive relief, Plaintiff seeks nominal damages[7] and any equitable relief deemed just and proper, reasonable attorneys' fees, costs, and litigation expenses. Id. at 13-14.

## IV. Record Evidence

### A. "Heightened Security" Cell Assignment

Plaintiff was transferred to FSP in 2008 after he murdered a corrections officer at Tomoka Correctional Institution. Pl. Dep. at 4-5. Between 2008 and 2011, Plaintiff was housed in maximum management at FSP. Id. at 5. See also Palmer Dep. at 24. On March 23, 2011, after Plaintiff was convicted and sentenced to death, he was moved to death row and immediately placed in a "heightened security" cell. Pl. Dep. at 5; Pl. Dec. ¶ 4. A heightened security cell is one with a solid steel door (solid door cell) as opposed to one with bars (open bar cell). Pl. Dec. ¶ 5; Pl. Dep. at 12.

_____

[7] The Court previously found Plaintiff is limited to nominal damages under the Prison Litigation Reform Act (PLRA) as to his claims against the supervisory defendants. See Order (Doc. 68).

<u>See also</u> Palmer Dep. at 19 (stating there are five "reinforced cells" on death row, which are reserved for inmates on heightened security); Gay Dep. at 10 (recognizing that confinement in a solid door cell is considered "heightened security").

At deposition, Plaintiff described the differences between solid door and open bar cells: solid door cells have a steel door with only one small window, while open bar cells have bars down the front allowing inmates to see out, reach out, and communicate; the air quality in solid door cells is poor; inmates in solid door cells are not permitted to have entertainment or comfort items, such as televisions, radios, computers, access to the canteen, reading materials from the library, or fans, while inmates in open bar cells enjoy such privileges; inmates in solid door cells sleep on a concrete slab, while inmates in open bar cells sleep on a metal bed that flexes; the shelf available for eating and writing is smaller in solid door cells than in open bar cells; and inmates in open bar cells receive cell-front visits from members of the church, while those in solid door cells do not. Pl. Dep. at 13, 14, 15, 18-19.[8]

---

[8] Defendants do not dispute Plaintiff's description of the differences between solid door and open bar cells. <u>See</u> Def. Motion at 8-9.

Plaintiff remained in a solid door cell for a little over five years, from March 2011 until July 2016.[9] Pl. Dep. at 15; see also Pl. Dec. ¶ 9. In July 2016, an officer told Plaintiff he had "received a telephone call from the administration" with an order to move Plaintiff to an open bar cell. Pl. Dep. at 47. Plaintiff was housed in an open bar cell for a couple of months, and then he was returned to a solid door cell in about September or October 2016. Pl. Dep. at 16; Pl. Dec. ¶ 14. At that time, he received a similar explanation for his return to a solid door cell: the administration "got a call and [he] was to be moved back." Pl. Dep. at 47-48. Plaintiff remained in a solid door cell for about five or six months, until March 2017, when, without explanation, he was again moved to an open bar cell. Id. at 16, 48. Plaintiff said, after March 2017, he was moved "a couple more times . . . behind the [solid] door," though he could not recall how many times or the dates. Id. at 16-17.

The last time Plaintiff was placed in a solid door cell was because of a disciplinary infraction in July 2017, following an altercation with another inmate while in the recreation yard. Id.

---

[9] In his deposition, Plaintiff testified he was moved from a solid door to an open bar cell on July 21, 2016. Pl. Dep. at 15. However, in his declaration, Plaintiff says he was moved on or about July 15, 2016. Pl. Dec. ¶ 9.

at 17.[10] Plaintiff remained in the solid door cell for about twenty days, returning to an open bar cell on August 9, 2017. Id. Plaintiff has not been moved back to a solid door cell since. Id.

Plaintiff had no disciplinary charges lodged against him between 2011, when he was transferred to death row and placed in a solid door cell, and 2016, when he was moved to an open bar cell (the first time). Id. at 43; Palmer Dep. at 11; Def. Motion at 11-12, 18.[11] When Plaintiff filed a grievance asking why a restriction had been imposed against him even though he had not committed a disciplinary infraction, a prison official informed him he was housed in a cell "for heightened security due to [his] . . . crime that sent [him] to death row." See Pl. Ex. E at 2. Defendant Palmer, on the other hand, offered a different explanation for Plaintiff's cell assignment, maintaining the cell assignment was not related to Plaintiff's conviction. Palmer Dep. at 14.

Defendant Palmer testified Plaintiff was placed on a "heightened level of security" because he had a "propensity for . . . violence" as demonstrated by his 1994 conviction (for which he received a life sentence) and the 2011 murder conviction. Id. at

---

[10] According to Plaintiff, the other inmate involved in the altercation with him was not similarly disciplined by being moved to a solid door cell. Pl. Dep. at 17.

[11] Defendant Palmer testified he believed Plaintiff was disciplined in 2015 for an "obscene, profane act charge." Palmer Dep. at 4. However, Defendant Palmer could not be sure, and Defendants offer no documentary evidence of such a charge.

12, 16. Defendant Palmer explained, "from a behavioral risk assessment standpoint [Plaintiff had] demonstrated a pattern of violence towards others." Id. at 16. According to Defendant Palmer, Plaintiff had to regain the trust of administrators to be moved to an open bar cell. Id. at 17. However, Defendant Palmer also stated, "[Plaintiff] committed one of the most heinous crimes that you can commit inside of a prison, and that is murder on a female correctional officers." Id. at 12.

Plaintiff offers the affidavit of Dr. Michael S. Maher, who is a "board certified psychiatrist specializing in general and forensic psychiatry" and evaluates inmates in FDOC facilities. Maher Aff. ¶¶ 2, 3. Dr. Maher avers Plaintiff was "confined in a heightened security, disciplinary-type cell with limited human interaction, except for prison officials, for over five (5) years and intermittently since then." Id. ¶ 4. According to Dr. Maher, the conditions of Plaintiff's confinement, with sporadic out-of-cell recreation and limited contact with others, can have "a profoundly negative impact on [a] prisoner's mental health – due to lack of outside human contact and interaction – and poses a significant risk of serious harm to [an inmate's] well-being." Id. ¶ 5.

Plaintiff testified he feels physically better when he is in an open bar cell as opposed to a solid door cell. Pl. Dep. at 13. He avers the conditions in a solid door cell are similar to those

of "solitary confinement in that it severely restricts [his] ability to communicate with other human beings." Pl. Dec. ¶ 6.

## B. Visitation Privileges

According to Defendant Palmer, when Plaintiff was sentenced to death row in 2011, his privileges should have "automatically reverted to contact visitation." Palmer Dep. at 25-26. Plaintiff testified he indeed had contact visitation when he was first sent to death row in 2011. Pl. Dep. at 5-6. However, in early 2013, Defendant Palmer learned Plaintiff had contact visitation, which he thought was an error. Palmer Dep. at 26. As such, Defendant Palmer changed Plaintiff's visitation privileges to non-contact. Id. See also Pl. Dep. at 9. Defendant Palmer believed, based on the nature of Plaintiff's offense (the murder) and his "pattern of behavior," the Institution Classification Team (ICT) should have placed Plaintiff on non-contact visitation status when Plaintiff initially was sent to death row. Id.

Defendant Palmer testified Plaintiff had a violent history and a "pattern of behavior," and Palmer "did [not] trust [Plaintiff] when [Palmer] was off at night or on weekends." Id. at 26-27. According to Defendant Palmer, a "behavioral risk assessment would say that [Plaintiff] was at risk for . . . repeat behavior." Id. at 28-29.[12] Defendant Palmer said Plaintiff is

---

[12] Defendants do not provide a behavioral risk assessment for Plaintiff.

different from other inmates on death row, though he did not explain how. Id. at 33.

Plaintiff testified Defendant Palmer told him he was being denied contact visitation because of Plaintiff's "actions," for which Plaintiff was "warned that [he] would suffer the consequences." Pl. Dep. at 49. Plaintiff did not know what "actions" Defendant Palmer was referring to, though he assumed it was his murder conviction. Id.; see also Pl. Dec. ¶23. Plaintiff also testified Defendant Maddox stated Defendant Palmer changed Plaintiff's visitation status "due to [his] conviction." Pl. Dep. at 11.

Plaintiff has not had a visitor since 2006. Pl. Dep. at 6. However, in 2013, two people tried to visit him but were prevented from doing so.[13] Id. at 53, 56.

## C. Recreation Privileges

According to Plaintiff, inmates on death row have two kinds of outdoor recreation: communal recreation and cage (solo) recreation. Pl. Dep. at 23. See also Pl. Dec. ¶ 7. Defendant Palmer testified death row inmates "automatically" have communal, outdoor recreation unless the ICT imposes a restriction. Palmer Dep. at

---

[13] It does not appear Plaintiff's visitors were prevented from seeing him because of his being on non-contact visitation status. Plaintiff's aunt told Plaintiff by letter that she attempted to arrange a visit with him, but she "was given the runaround." Pl. Dep. at 55. A friend also tried to visit Plaintiff and, when she arrived at the prison, was "turned away." Id. at 56-57.

25-26. Inmates with communal recreation privileges can interact with other inmates and play team sports such as basketball or volleyball. Pl. Dep. at 28. Inmates in communal recreation also have access to a water fountain and a kiosk machine (to email family members). Id. at 33, 34.

Inmates assigned to solo recreation, however, are restricted to a cage that roughly measures ten-feet tall by twelve to fifteen-feet wide by twenty-feet long. Pl. Dep. at 30; Pl. Dec. ¶8; Palmer Dep. at 48. When confined to cage recreation, inmates are not permitted to talk to others (even though they can see and hear inmates exercising in the communal area), are not permitted to bring anything with them, and have no access to water or the kiosk machine. Pl. Dep. at 29-30, 33, 34.[14] Defendant Palmer, however, testified water is provided for inmates exercising in the cage. Palmer Dep. at 50.

When Plaintiff was sentenced to death row in 2011, he was not permitted to enjoy communal recreation. Rather, he was automatically assigned to cage recreation. Pl. Dep. at 5-6, 23. Defendant Gay testified she understood Plaintiff's recreation privileges were restricted because of "the murder for which he was convicted." Gay Dep. at 53. On March 31, 2013, Plaintiff submitted

---

[14] Plaintiff avers when he is denied communal recreation privileges, he must choose whether to exercise in the cage or use the kiosk, which he has done three times. Pl. Dec. ¶ 19.

an informal grievance inquiring about his recreation status, saying he was assigned to the "cages that are used for disciplinary purposes." See Def. Ex. G at 2. Defendant Maddox responded to the grievance, informing Plaintiff his outdoor recreation status complies with Florida Administrative Code rule 33-601.830(j)3. Id.

The first time Plaintiff received communal recreation was when he was moved from the solid door cell to an open bar cell in July 2016, but each time he subsequently was moved back to a solid door cell, he was again restricted to cage recreation. Pl. Dep. at 24, 25.

Plaintiff testified he has not had to seek mental health counseling because of his inability to participate in communal recreation. Id. at 32. However, he also asserts the officers discourage inmates from going to callouts, and the mental health counselors "don't want to talk to [inmates] like that." Id. Plaintiff said he did not feel depressed because of the limits on his recreation, but rather because of the "isolation." Id. at 33. Plaintiff agreed he felt "a difference" in himself when he was granted communal recreation privileges as opposed to exercising in the cage. Id. at 42.

### V. Legal Analysis & Conclusions of Law

### A. Defendants' Motion for Summary Judgment

Defendants assert Plaintiff fails to state claims against the supervisory defendants under the Eighth and Fourteenth Amendments.

Def. Motion at 5. As to the conditions of confinement claim, Defendants maintain Plaintiff's allegations do not rise to the level of an Eighth Amendment violation but rather suggest he faced "mere discomfort" or an inconvenience. Id. at 7. For instance, Defendants argue, when Plaintiff was in the heightened security (solid door) cell, he was not "deprived of any human need," was not subjected to the infliction of pain, and did not endure conditions that were extreme or posed an unreasonable risk to his health or safety. Id. at 10-11. Rather, they contend, Plaintiff was provided items for his health and hygiene, such as dental care and grooming items, and he was deprived only of "comfort" items, such as a flexible metal bed, the ability to communicate with other inmates, a television, radio, computer, fan, and canteen privileges. Id. at 8-9, 11.

As to the due process claim, Defendants assert Plaintiff's placement in a solid door cell and restrictions on his recreation and visitation privileges were not arbitrary but were rationally related to prison security and administrative needs. Id. at 16, 18, 19. They further state the Florida Administrative Code permits prison officials to restrict recreation privileges of inmates convicted of murdering corrections officers, without notice or hearing. Id. at 16, 17, 18, 20.

Finally, Defendants assert a qualified-immunity defense, contending there was no clearly established law placing them on

notice of a potential Eighth or Fourteenth Amendment violation when they placed Plaintiff on heightened security status and restricted his recreation and visitation privileges. Id. at 21, 24.

As the Court previously ruled, Plaintiff states a claim under the Eighth and Fourteenth Amendments, and the constitutional rights at issue were clearly established. See Order (Doc. 68). On summary judgment, Plaintiff has gone beyond the pleadings, offering evidence to substantiate his allegations, most of which Defendants do not dispute.[15] After review of the evidence, the Court finds there remain genuine issues of material fact with respect to whether the supervisory defendants' conduct violated Plaintiff's constitutional rights. As such, Defendants' motion is due to be denied.

## B. Plaintiff's Motion for Injunctive Relief

Plaintiff seeks summary judgment on count four of his operative complaint, in which he seeks declaratory and injunctive relief against the supervisory defendants. See Pl. Motion at 1-2. Plaintiff asks the Court to enter an order declaring the FDOC violated provisions of the Florida Administrative Code ("the Code") related to Plaintiff's confinement conditions and exercise

---

[15] Defendants dispute only whether Plaintiff had access to water when in cage recreation. See Palmer Dep. at 50.

and visitation privileges, and enjoining Defendants from engaging in further such violations. Id. at 19-25.

In response, Defendants contend Plaintiff's requests for declaratory and injunctive relief are moot because Plaintiff has been transferred and is no longer housed in a heightened security cell. See Def. Resp. at 5.

As a threshold matter, irrespective of the mootness issue, the Court notes that Plaintiff is not entitled to declaratory or injunctive relief on summary judgment. Notably, Plaintiff does not move for summary judgment on the substantive constitutional claims, nor does he explicitly address them in his motion. See Pl. Motion at 19-24. Rather, Plaintiff premises the relief he seeks in his motion solely upon his contention that the conditions of confinement he was forced to endure at FSP were not properly imposed under the applicable provision of the Code. Id.

Even if Plaintiff were to demonstrate Defendants' conduct was not justified under the Code, such a finding does not necessarily mean Defendants violated Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments. Plaintiff does not argue he has demonstrated as a matter of law that Defendants violated his constitutional rights. Until Plaintiff proves his claims, he is not entitled to permanent injunctive relief. See Thomas v. Bryant, 614 F.3d 1288, 1317 (11th Cir. 2010) ("To obtain a permanent injunction, a party must show . . . he has prevailed in

establishing the violation of the right asserted in his complaint."). Accordingly, Plaintiff's motion is due to be denied.

Because the Court finds neither party is entitled to judgment as a matter of law, the Court will refer the case to the assigned Magistrate Judge to conduct a settlement conference. To enable the parties to productively discuss settlement terms, however, the Court is compelled to address Defendants' contention that Plaintiff's requests for declaratory and injunctive relief are moot.

Plaintiff acknowledges in a status report (Doc. 108; Pl. Report) that he is now housed at UCI where he is in an open bar cell and has the same recreation privileges as other death row inmates. See Pl. Report at 1. However, Plaintiff's "contact visitation privileges remain suspended." Id. Despite now being in an open bar cell, Plaintiff maintains the controversy remains ripe for review because "Defendants have a history of moving [Plaintiff's] cell and imposing restrictions seemingly without justification[, which] indicate[s] that the violations are capable of repetition." Id.

Plaintiff's contention requires the Court to accept the premise that the FDOC imposed the complained-of conditions upon him without "justification." As such, the Court must closely analyze the relevant Code provision to which Defendants cite as justification for the confinement conditions of which Plaintiff

complains. That provision is rule 33-601.830 ("the Rule"), which exclusively addresses death row.

### i. Heightened Security

The Rule only "briefly addresses cell assignments" for death row inmates. See Pl. Motion at 20. Under the Rule, all death row inmates are on "single-cell special housing status . . . separate from the general population housing." See Fla. Admin. Code r. 33-601.830(1). Both Defendants Palmer and Gay referenced "heightened security" status in their depositions, though neither could define what that phrase means. In fact, Defendant Palmer conceded the phrase "heightened security" is not defined anywhere in the Rule. Palmer Dep. at 80. Defendant Gay was unfamiliar with such a status as a separate classification for death row inmates. See Gay Dep. at 36. When asked whether the term "heightened security" is one "used for classification of a death row inmate," Defendant Gay responded, "[n]ot that I know of." Id.

Defendants Palmer and Gay also testified that "heightened security" status is not necessarily the same as "disciplinary confinement." Defendant Palmer testified that death row inmates, as "a unique population" inside the prison, generally serve disciplinary confinement inside their cells. Palmer Dep. at 22. Defendant Palmer stated, if there is "no imminent risk where we feel like the person needs to go back behind . . . a solid door then they would be placed in disciplinary confinement in their

cell." Id. Similarly, Defendant Gay testified an inmate is not necessarily in disciplinary confinement if he is in a solid door cell. Gay Dep. at 36.

Defendants' testimony comports with the plain language of the Rule, which does not reference "heightened security" as a separate death row classification or as a form of discipline. See Fla. Admin. Code r. 33-601.830(1).[16] Indeed, the phrase "heightened security" appears only one time in the Rule, in subsection (7)(j), which describes exercise privileges and restrictions the FDOC may impose on those privileges. See Fla. Admin. Code r. 33-601.830(7)(j)3.d. (noting the ICT may restrict an inmate's recreation privileges for, among other reasons, "[a]ny major rule violation which requires heightened security measures"). Not only is there no definition of or policy for a so-called "heightened security" status, Defendant Palmer, at his deposition, was unbale to plausibly articulate why Plaintiff was assigned to such a status.

---

[16] Moreover, there is no provision in the Rule permitting the whole-cloth removal of all "comfort" or "personal" items from a death row inmate's cell without justification and review. In fact, subsection (7)(a) provides a list of items death row inmates "shall" be provided: clothing; bedding; hygiene and medically necessary items; personal property (televisions, fans, radios, etc.); canteen privileges; writing utensils (security pens); and reading materials. See Fla. Admin. Code r. 33-601.830(7)(a). When Plaintiff was in a solid door cell, he was denied many of the "comfort" items listed in this subsection, though there appeared to be no justification for the denial.

Defendant Palmer stated Plaintiff was on heightened security status because Plaintiff had a "history" and "pattern" of violent acts; had an "assaultive history"; could not be trusted; and, according to a behavior risk assessment, "was at risk for . . . repeat behavior." Palmer Dep. at 16, 17, 27-29. However, Defendant Palmer could not explain why Plaintiff was more violent or dangerous than other death row inmates, all of whom are serving death sentences because of violent acts. For instance, Defendant Palmer did not describe any incident in which Plaintiff was violent while housed at FSP between 2008 and 2016. Nor could he have. The evidence shows Plaintiff remained discipline-free until 2017, when he admittedly engaged in a physical altercation with another inmate.[17]

Recognizing Plaintiff remained discipline-free until 2017, Defendant Palmer testified, "the lack of disciplinary infractions in and of itself is not – not necessarily an indicator of positive adjustment." Id. at 55. Again, though, Defendant Palmer did not describe by way of concrete example why he deemed Plaintiff more of a risk than other death row inmates. Additionally, Defendant Palmer did not explain the results of any "behavioral risk assessment" for Plaintiff, and Defendants provide no documentation

_____

[17] As noted previously, Defendant Palmer thought Plaintiff was disciplined for an obscene word or act in 2015, though Defendants offer no documentation of such a charge.

of such an assessment having been completed. The only examples of Plaintiff's violence to which Defendant Palmer refers were Plaintiff's convictions. See id. at 11-12, 28.

While Defendant Palmer disavowed that Plaintiff's murder conviction affected the decision to place Plaintiff in a solid door cell, id. at 28, the evidence belies his contention. First, a prison official expressly informed Plaintiff he was housed in a cell "for heightened security due to [his] . . . crime that sent [him] to death row." See Pl. Ex. E at 2. The crime that sent Plaintiff to death row was the murder of a corrections officer. Moreover, in the parties' joint pretrial statement, Defendants acknowledge Plaintiff's murder of a corrections officer justified the restrictions Defendant Palmer imposed upon Plaintiff at FSP. See Pretrial Stmt. at 3-4. Defendants state the following:

> The Plaintiff brought this lawsuit to compel Defendants to treat him like every other similarly situated death row inmate, and yet, Plaintiff is not similarly situated to any other inmate on death row. Plaintiff was the only prisoner at [FSP], who was serving a life-sentence for killing in [sic] a guard …

Pretrial Stmt. at 3-4 (emphasis added). Defendants continue, "Plaintiff was placed in heightened security because the Warden [Palmer] felt it necessary based on his interactions with Plaintiff and the fact that Plaintiff had killed an officer while in prison." Id. at 4.

As discussed, Defendant Palmer offered no examples of interactions he had with Plaintiff that demonstrated Plaintiff posed a risk of imminent harm to others such that Plaintiff should have been housed in a solid door cell for five years, from 2011 until 2016. Instead, the evidence permits the inference that Plaintiff was placed on heightened security status in 2011 solely because he murdered a corrections officer.

### ii. Recreation

The Rule permits the ICT to restrict the "place and manner" of an inmate's recreation, which includes a restriction on interacting with other inmates, under the following circumstances:

> [I]f the inmate has been convicted of or found guilty through the department's disciplinary process . . . or an investigation sufficiently documents that the inmate was involved in:
>
> a. Assault or battery, <u>murder, or attempted murder of a correctional officer</u>, volunteer, visitor, or other inmate within an institution; . . . .

See Fla. Admin. Code r. 33-601.830(7)(j)3. (emphasis added). Defendants justify Plaintiff's lengthy cage recreation status (from 2011 through 2016) by reference to this subsection, which they interpret as allowing the ICT to restrict, without notice or other justification, the recreation privileges of a death row inmate who has been convicted of murdering a corrections officer. See Def. Motion at 17; Pretrial Stmt. at 5.

To interpret subsection (7)(j) as allowing the ICT to place a death row inmate in cage recreation solely because the inmate was convicted of murdering a corrections officer appears to defy the intent of the provision. Significantly, this subsection provides all death row inmates enjoy "out-of-doors" exercise unless there is a reason to impose a restriction, as set forth in paragraph 3. See Fla. Admin. Code r. 33-601.830(7)(j)3. (stating the ICT can restrict "the place and manner of outdoor exercise, such as an inmate's ability to interact with other inmates") (emphasis added).

Defendant Palmer himself testified that communal recreation is the default for all death row inmates. Palmer Dep. at 25-26. He stated that when Plaintiff was sentenced to death row, "without imposed penalties by the [ICT] . . . his privileges would have automatically reverted to . . . group exercise." Id. If group recreation is the default, then some basis logically must exist for subsequently restricting a death row inmate's recreation privileges, irrespective of the inmate's conviction. To interpret this provision as permitting FDOC officials to restrict a death row inmate's exercise privileges based upon the conviction for which he is serving his sentence is tantamount to condoning additional, arbitrary punishment.

Additionally, when subsection (7)(j)3. is read together with subsection (3) ("ICT Reviews"), it appears a restriction on an

inmate's recreation privileges is not intended to be imposed in perpetuity or based upon a condition that will never change. Subsection (3)(a) requires the ICT, every six months, to "conduct a review of a death row inmate when the inmate . . . [h]as had restrictions placed on his outdoor exercise pursuant to subparagraph (7)(j)3." <u>See</u> Fla. Admin. Code r. 33-601.830(3)(b)2. That there is a review policy suggests an inmate has an opportunity to regain communal recreation status at some point. Requiring the ICT to review a restriction that was imposed for a condition that will never change appears meaningless. If, as Defendants suggest, an inmate's recreation can be restricted simply based upon his conviction, the ICT can send an inmate convicted of murdering a corrections officer to cage recreation seemingly at the pleasure of the members of the ICT. Such a reading is at odds with basic concepts of due process.[18]

---

[18] That Plaintiff was never provided an explanation for the recreation restrictions imposed upon him over the years, aside from the July 2017 disciplinary charge, demonstrates the seemingly arbitrary manner in which subsection (7)(j) can be invoked. For instance, in July 2016, Defendants inexplicably reinstated Plaintiff's communal recreation status, though the nature of his conviction had not changed. And, Plaintiff's recreation privileges are not currently restricted (as of October 11, 2019), though, under Defendants' argument, he could be returned to cage recreation at any time given the fact remains: Plaintiff murdered a corrections officer.

### iii. Visitation

As with communal recreation, contact visitation is the default for death row inmates. See Fla. Admin. Code r. 33-601.830(7)(l); see also Palmer Dep. at 26 ("When [Plaintiff] was released from maximum management to death row . . . his privileges would have automatically reverted to contact visitation."). The Rule mandates contact visitation for death row inmates except in specific instances in which there are security concerns: "Death row visits shall be contact visits unless security concerns indicate that a non-contact visit is necessary, in which case the non-contact visit shall be approved by the warden in advance." See Fla. Admin. Code r. 33-601.830(7)(l) (emphasis added).

This provision is the sole basis upon which Defendants justify restricting Plaintiff's visitation privileges in perpetuity, beginning in about February 2013. See Def. Motion at 19; Def. Resp. at 4. Defendant Palmer testified at deposition that he decided Plaintiff's visitation privileges were to be restricted "because of the nature of [Plaintiff's] offense." Palmer Dep. at 26. The language of subsection (7)(l), however, suggests non-contact visits are to be imposed on a visit-by-visit basis, not as a permanent status.

For instance, the reference to an inmate visit in the singular ("a non-contact visit"; "the non-contact visit") implies an inmate may have a restriction imposed in advance of an individual visit

if the circumstances of that visit pose security concerns. Of import, unlike recreation restrictions, the Rule does not require the ICT to periodically review restrictions imposed on a death row inmate's visitation status. <u>See</u> Fla. Admin. Code r. 33-601.830(3)(b). That there is no review process for a death row inmate's visitation status suggests any denial of an inmate's right to contact visits should be imposed per visit, with each non-contact visit being approved by the Warden "in advance" of that visit.[19]

### iv. Mootness

Upon close examination of the relevant language of the Florida Administrative Code, the Court finds some merit to Plaintiff's assertion that Defendants arbitrarily placed Plaintiff on heightened security status and restricted his recreation and visitation privileges.[20] Additionally, the Court finds Plaintiff's

---

[19] Plaintiff has not had a visitor attempt to see him since 2013. Pl. Dep. at 54, 56. Whether Plaintiff has had a visitor is not dispositive of whether the Rule permits Defendants to permanently restrict Plaintiff to non-contact visitation status. Significantly, Defendant Palmer restricted Plaintiff's visitation privileges after he "was made aware that [Plaintiff] had contact visits," not based upon review of a recommendation from the ICT with respect to a specific, planned visit. See Palmer Dep. at 26.

[20] The Court acknowledges, however, the Rule permits FDOC officials to impose appropriate restrictions on, and take disciplinary action against, an inmate who has been found guilty of a disciplinary infraction, such as the disciplinary charge against Plaintiff in 2017.

requests for declaratory and injunctive relief are not moot even though Defendants ceased some of the complained-of conduct.

When a government actor voluntarily ceases the conduct of which a plaintiff complains, the claim is not necessarily moot. Doe v. Wooten, 747 F.3d 1317, 1322 (11th Cir. 2014). The Eleventh Circuit recognizes, "[i]t is well settled that when a defendant chooses to end a challenged practice, this choice does not always deprive a federal court of its power to decide the legality of the practice." Id. Quoting the Supreme Court, the Eleventh Circuit observes:

> It is no small matter to deprive a litigant of the rewards of its efforts . . . . Such action on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought.

Id. at 1319. As such, a defendant who claims to have mooted an action by his own conduct "bears a formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 1322. Accord Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 531 (11th Cir. 2013) ("Since the defendant is free to return to his old ways, he bears a heavy burden of demonstrating that his cessation of the challenged conduct renders the controversy moot.").

A government actor who voluntarily ceases alleged wrongful conduct is entitled to a rebuttable presumption that the conduct

will not recur. Wooten, 747 F.3d at 1322. However, to receive the benefit of the presumption, the government actor must establish "unambiguous termination of the challenged conduct." Id. The presumption may be rebutted if there is "some reasonable basis to believe that the [conduct] will be reinstated if the suit is terminated." Id. In evaluating whether a government actor benefits from the presumption, courts analyze the following factors:

> (1) whether the termination of the offending conduct was unambiguous; (2) whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and (3) whether the government has consistently applied a new policy or adhered to a new course of conduct.

Id. at 1322-23 (internal quotation marks omitted). With respect to the first two factors, the timing of the government actor's voluntary cessation of the complained-of conduct is relevant. Id. at 1323. See also Rich, 716 F.3d at 531-32 ("[T]he timing and content of the decision are . . . relevant in assessing whether the defendant's 'termination' of the challenged conduct is sufficiently 'unambiguous' to warrant application of the . . . presumption in favor of governmental entities.") (alterations in original).

Voluntary cessation likely will not moot a controversy if the government actor provides no assurance it will not revert to its former ways after the litigation ends, or if the circumstances

suggest the defendant voluntarily ceased the offending conduct to avoid litigation. See id. (holding the FDOC failed to carry its burden because the policy change was made only after the plaintiff filed a counseled brief, and officials continued to defend the conduct as constitutional); Jager v. Douglas Cty. Sch. Dist., 862 F.2d 824, 834 (11th Cir. 1989) (holding the plaintiff's request for injunctive relief was not moot because the defendant ceased the conduct only under threat of litigation and continued throughout the litigation to argue the complained-of conduct was constitutional). See also Wooten, 747 F.3d at 1323-24 (holding the plaintiff's request for injunctive relief was not moot even though he was transferred to a state facility, because the bureau of prisons provided no assurance the plaintiff would not be transferred back to a high-security facility where the alleged wrongful conduct occurred).

Defendants fail to meet their "formidable" burden to show the conduct of which Plaintiff complains has been "unambiguously terminated" or that the allegedly wrongful conduct will not recur after this litigation ends. See id. Under the circumstances, it appears Defendants voluntarily changed Plaintiff's confinement conditions to avoid continued litigation. Of particular relevance here is the timing of Defendants' unexplained decision to change Plaintiff's cell and recreation status in July 2016. On February 25, 2016, the Court appointed counsel for Plaintiff (Doc. 18); on

May 23, 2016, Plaintiff's counsel filed the operative complaint; and by the end of June, Defendants Jones, McClellan, Palmer, and Gay were served (Docs. 24-27). By mid-July, Plaintiff was moved to an open bar cell and granted communal recreation privileges, with no explanation. See Pl. Dep. at 23, 47.

Also of significance, Defendants offer no assurance they will not again place Plaintiff on heightened security status in the absence of a documented disciplinary infraction. In fact, Defendants steadfastly maintain the conditions of which Plaintiff complains were not unconstitutional but were appropriately imposed upon him under the Code. See Def. Motion at 7.

Even though Plaintiff is now at UCI, there is a "reasonable basis to believe that the [conduct] will be reinstated if the suit is terminated." Wooten, 747 F.3d at 1322. Plaintiff sues the Secretary of the FDOC, and he remains subject to the provisions of the Rule Defendants cite to justify the allegedly wrongful conduct. See Hardwick v. Brinson, 523 F.2d 798, 800 (5th Cir. 1975)[21] (holding a justiciable controversy existed even though the plaintiff was housed at a different correctional institution, because the defendant, the head of the state prison system, did not promise the plaintiff would not be returned to the prison where

---

[21] The Eleventh Circuit adopts as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

the conduct occurred). Even more, Plaintiff's contact visitation privileges remain suspended.

Given Defendants continue to defend the alleged wrongful behavior of which Plaintiff complains, they fail to demonstrate that "behavior could not reasonably be expected to recur." <u>See Wooten</u>, 747 F.3d at 1322. Thus, it is not "absolutely clear that [Plaintiff] no longer had any need of the judicial protection" he seeks. <u>Id.</u> at 1319.

Accordingly, it is now

**ORDERED:**

1.   Plaintiff's Motion for Summary Judgment (Doc. 86) is **DENIED**.

2.   Defendants' Motion for Summary Judgment (Doc. 87) is **DENIED**.

3.   Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mark S. Inch is substituted as the proper party Defendant as the Secretary of the FDOC with respect to the official-capacity claim against former Secretary Jones. The **Clerk** is directed to make the appropriate entries on the docket to reflect the substitution.

4.   This case is **referred** to the Honorable James R. Klindt, United States Magistrate Judge, to conduct a settlement conference. By **January 23, 2020,** the parties shall confer and contact the chambers of Judge Klindt with proposed dates the

parties and their counsel are available for a settlement conference.

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of January, 2020.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:   Counsel of Record
     Judge Klindt's Chambers